Clerk, please call the next pitch. 4-16-0744 Monterey Coal Company v. Workers' Compensation Comm'n May it please the Court, Counsel Bob Mueller on behalf of Monterey Coal Company in this one. I wanted to start out with suggesting that the arbitrator and therefore the Commission did not pay as much attention to detail as they should have in their decision. The decision indicated that the further exposure would be detrimental to claimant's health. But both Dr. Mathur, his family doctor, and Dr. Paul, his IME doctor, indicated that it was a risk. Not a would be, it was a could be. Maybe not a big difference, but it is something. There also is no indication that there was a diagnosis as of 10-23-07 when Dr. Smith read the original chest x-ray films. That date is not contained in the decision that I could see. It is inconsistent with the dates that are in that decision. Further, there is no indication really of when Mr. Goodson might have known that he was diagnosed with anything here. This was not a treating medical situation. Now, what we have here is as of August 31, 2006, Mr. Goodson had put in 33 years of coal mine employment and decided that was it. He specifically testified that he talked to his wife about it and told his wife, I've had enough. So at that time, 8-31-06, there was no diagnosis of any lung disease or condition. Is it your theory that in order to be entitled to benefits under the Occupational Disease Act for a coal miner, he has to be diagnosed with CWP before he quits? Is that your theory? No, wait, no, no. I'm not saying he would not be entitled to anything. What I'm saying is, based on the facts in this case, he's not entitled to a wage differential. But that's not my, that's my question. Well, that's why, I'm sorry, I didn't understand. My question is, in order to be entitled to a wage differential, your theory is he must be diagnosed before he leaves. Is that correct? It's not that simple, Your Honor. What I'm saying here is, when this guy was diagnosed, he was not working as a coal miner. I understand that. So I'm asking you a question. Are you saying he must be diagnosed while he's still working as a coal miner? That's a yes or a no. There's more to it than that. That's what I say. Well, Counsel, either he has to be diagnosed before he stops working as a coal miner, under your theory, and that's exactly what's in your brief. Okay, yes. He has to be diagnosed. Well, there's no case that says that. Is all it says? All I'm answering is yes or no, Your Honor. But there's no case that says so. You haven't got a single case that says so. There are other factors involved in this case. All he has to do is establish that, number one, he's got a work-related occupational disease, and he's got two doctors that says he does. You have two doctors that says he isn't. The commission decided he did. And he has to say that that work-related injury or disease partially incapacitates him from pursuing his usual and customary line of employment, and that he suffered an impairment in earnings as a result. That's all he has to establish. And he didn't do it. Right. Why not? He says he can't go back to work as a coal miner. But he wasn't working as a coal miner when they made the diagnosis. That's the point. So what? The question is, was he working as a coal miner when he had CWP? But he wasn't diagnosed with it. So what? I think it's important. Well, I don't think so. Well, I don't get your vote then, I guess. I don't think you're going to get any. But the question becomes, have you got a single case that says that? I cited the Dawson case in my brief, Your Honor, and I will go ahead and get to that. In the Dawson case, this court said there's no age differential. They indicated the reasoning was, the reason for leaving coal mine employment or retiring was not based on any condition. No doctor said that he couldn't do his job as a coal miner due to respiratory problems. No medical treatment for a breathing problem was shown while he was working as a coal miner. No doctor said he should retire or seek other employment for any medical reasons. And the medical examination which established the diagnosis of a work-related lung disease took place a long time after, over a year after he last worked as a coal miner. Does that mean he didn't have the condition when he retired or he just wasn't diagnosed? You're saying the two are the same. It has to be your argument. I'm sorry. To be precluded from doing a job, he has to have the diagnosis. That's my point here. How can he feel that he can't do this job because he would put himself at risk for his condition getting worse if he doesn't even have the diagnosis? That makes no sense to me, and that's my point. How about if he can't breathe? Pardon? Well, if he can't breathe, if his condition is so bad that he can't breathe, why didn't he go see a doctor? Why don't we have medical records and evidence? But he didn't testify that he couldn't breathe. He said he'd had enough of the job. There's no evidence that he couldn't do his job at the time he left when he was 36. So you're saying there's no evidence in the record that there was medical reason for him ceasing his work as a coal miner. That's what I'm saying. Okay. And you're saying Dawson. And Dawson is the case that you believe is the pivotal case here, right? I think this case is pretty much on point with these factors in Dawson that I just went through. It's the same as this one. They found in that case there was no reduction in earnings, therefore no 8D1 case. The court found specifically that the claimant failed to prove that but for the injuries, he would have been in full performance of his coal mine job duties. And that's what we have here. Mr. Goodson, of course, could not have been in performance of his coal mine duties because he'd already retired from those duties and gotten another job. He never showed any interest in getting any job as a coal miner after he left Monterey on 831-06. There's no indication that he tried to get back to work for Monterey. There's no indication he tried to go to work for any other coal company, much less if there was any other coal company in the area that he could have gotten a job with. And there's no indication that he wanted to do anything except work in the hardware store where he got a job shortly after he stopped working as a coal miner. If you go through, and I won't go into all the details, he testified for at least a page about, hey, there was this, this. I talked to my wife, as I already said, and I just, I had enough. That was it. I didn't want to be a coal miner anymore is what you take out of his testimony here. So he didn't want to be a coal miner. Did he testify that he was having breathing problems for seven to eight years before he left the mine? Did he say that? Yes, he did. Did he say that he was a continuous mine operator, which was one of the dirtiest and dustiest jobs that you can get in the mine? Yes. Did he put on another witness to verify that? Yes. Did he testify that he decided to quit coal mining because he felt that he could no longer do the job? No. He said he got to the point where he did not want to, could not do that job anymore. It just affected him. He had enough time in and he just wanted to get away from it. Did he testify that he was taking a physical toll on him because he was coughing up black stuff and that the substance was coming out of his nose? He said the dust and everything. He felt like it was taking a toll on him. He knew he had a lot of it, coughing up black stuff, blowing his nose black all the time. He decided to end his career as a coal miner a few weeks before. He talked to his wife and told her he had had enough. Again, there's no evidence here that this guy couldn't do his job. Even assuming for the moment that he had breathing problems, there's no evidence that that kept him from doing his job. Can a coal miner, can an individual who is diagnosed with CWP ever be sent back into a mine? What do the doctors say? What do his doctors say? His doctors say no. No one with CWP can be sent back to a mine. It's a risk to your health if you go back. If you already have a diagnosis, let's say of CWP, it's a risk to your health. No, no, no, no. It's not if you already have a diagnosis. If you have CWP, it can be diagnosed later. If you have it, you can't go back in the mine because it's a risk to his health. It's a risk. Okay. You can do it, but it's a risk. Okay. I suppose I should split the verb. No, I'm just saying. You can, but you may not for your health. If you're concerned about your health, you shouldn't. I'm just pointing out that's what those guys said, those doctors. It's a risk. It's not a guarantee. It's a risk that you could get worse. But he didn't have the option of deciding whether to take that risk or not. Did he have two doctors that testified, number one, in their opinion he had CWP, and at least in the opinion of one of them, it was caused by exposure to coal dust? Dr. Paul indicated that he had CWP and it was caused by exposure to coal dust. That's true. So if he had CWP and it was caused by an exposure to coal dust and he last worked in a mine in August of what, 2006, and didn't work in any mines after that, then logic would tell you that he had CWP when he left the mine if it was caused by coal dust. Or from where did he get it? From his fireplace at home? It is a progressive disease, but the point is that he didn't know he had it. It didn't preclude him. No diagnosis as of 8-31-06 precluded him from further coal unemployment. He quit himself. He quit himself. There was no diagnosis. Mr. Mueller, if I quit because I believe that I am having breathing problems and can't go back into that mine because I'm coughing up black stuff, under your theory is unless he's diagnosed, evidently he's not leaving coal mining because of an impairment. And what I'm saying to you is diagnosis and impairment are not coequal terms. Either he had it or he didn't have it. And if he had it, does having it impair his ability to work in that field? We don't know if he had it when he left the coal mine. Well, where did he get it? We don't know if it was diagnosable at the time he left the coal mine. What does diagnosable have to do with it? The question is did he have CWB? It has to be diagnosed before you can say, oh, you can't go back to that job because you risk getting worse. Here's the question, probably because I think everybody's going down rabbit holes here. The question is can you reconstruct a diagnosis back to a point in history? I mean, isn't that really what we've got here? Some medical evidence from a 30,000-foot perspective. We've got a case here where there's been a construction of presumptive evidence of an inference back to a prior point in time. That he had it when he retired. But I get back to the part. And is that permissible? To establish something in the past. It may be, but it's not permissible, in my opinion, to establish a wage differential, which is what we're talking about here today. Okay, so you're all in on it. You're being candid. You're all in on the theory that unless the diagnosis was made before he retired, you can't get a wage differential. That's what you're saying, right? If no doctor says it before he retires, you can't get it. Is that your position? Yes. In general. But I like to look at this case. Well, that's what this case is about. That's what you're arguing. But this guy left his job as a coal miner not because of anything any doctor said, not because of any diagnosis. He left on his own after talking it over with his wife. And then later, a year later, he got the diagnosis. There's evidence in the record. This man left coal mining because he couldn't breathe anymore. And so if he can't breathe anymore and it's caused by coal mining, and a doctor says it's CWP, when you talk about reconstructing, if the man never went back into a mine from August 26th to the day he was diagnosed, and he was diagnosed as having coal worker's pneumocomiosis that was as a result of inhaling of coal dust, the only place he could have gotten it would have been the mine. And if he got it in the mine and it impaired his ability ever to work in that mine again, you've got a wage differential on your hands. I don't think this is a wage differential case, Your Honor. But this guy never said he couldn't breathe at the time he left the mine. He never said he couldn't do the job. And no doctor said that either. That's the point here. He may have said he had breathing problems, but he never said they impaired his ability to do his job as a coal miner. Never did he say that. Okay. I think we understand your position. Anyway, in addition to there being no diagnosis, nothing happened on 8-3106. He didn't have a claim on file that day. He didn't say, oh, there was a big puff of coal dust that came up. Nothing happened. He took the job at the hardware store and never looked back about coal mining. He did not want to be a coal miner. So I don't think there should be a wage differential situation here where this guy never had any intention of going back to being a coal miner. To me, it's like speculation. It's saying, well, if he wanted to, then he would be entitled to a wage differential. That's not the case here. Plus, we don't have any evidence that there is a coal mine job that he could go back to, even if he wanted to, that paid what this decision says he would be making, not to mention the problems with the years before, the $28.415. It wasn't the same in the years before. I don't think the wage differential has been proved in this case, and I think based on that, based on the Dawson case, it's against the manifest way of the evidence, reverse and remand. Thank you. Thank you. We have time to reply. Thank you. Counselor, you may respond. Mr. Moore, Mr. Muller. My name is Bruce Besore, and I represent Gary Goodson. This is a manifest weight argument, and respondents' burden is great, and there is sufficient evidence in the record for all the commission's decisions, and the decision should be affirmed. The commission found the petitioner suffered from CWP and asthma, and in doing so, the commission found Dr. Paul and Dr. Mather to be more persuasive than Dr. Tudor. That's the commission's call to make, and it's in keeping with the record. Mr. Besore, can you address his core principle argument that we've been going back and forth on? It seems to be in order to be entitled to a wage differential award, an employee must, prior to leaving his usual and customary employment, must be diagnosed with an employment-related condition which incapacitates him from pursuing that employment. What is your take on that argument? Well, aside from the logistical problem, that would basically mean there would never be a wage differential because no one's diagnosed. Monterey's got this problem with the chronology, but in medicine and the law, that's just the way it is. Some things always come in second. The arrest always comes after the crime. The incarceration always comes after the arrest. The diagnosis comes after the disease. The disease always comes after the symptoms. The patient goes to the doctor after he thinks he's got a problem, and it's always the job of the commission to reconstruct, particularly with a disease. You know, it's not a broken bone that happened today and I can't walk. A disease that comes on over years, a slowly-progressed disease. So the commission, in 100% of the cases, is faced with reconstructing from the evidence it has and going back in time. One example is a widow's case. The minor last worked in 1995, and he dies in 2014. And the question before the commission is, did he satisfy 1F? Can you prove that there was disablement within two years when he left the mine? Way back then. Well, it's the job of the commission to do that. It either agrees there was disablement or there wasn't. It's no different here. So I think that always happens. This, and I want to go straight to the Dawson case.  But there was a reason for that. Dawson had a 10% award at the commission. And he had CWP and only CWP. And we wanted to find out if X-ray only CWP would support a wage differential. Well, it didn't. But that's why we brought it. And we specifically brought that case because it was clean. That's all he had was the X-ray diagnosis. So the question was, is that medical contraindication of further exposure, is that sufficient to walk out on a wage differential? In Dawson, the only disease was CWP. The only disablement claim was the medical contraindication of further exposure. And at that time, 20 years ago, we didn't talk about the functional impairment that must come along with CWP. We never thought about it. It didn't come up. That was not evidence. There was no functional impairment discussion in that case. The PFTs were normal. And Petitioner's own expert, Dr. Sanjabi, said he only has mild shards of breath, not even more than I would expect. But the most important, and he was capable of heavy manual labor. All that's different than this case. What did the commission do in Dawson? The commission said, for the different reasons, based on that case, and as my departed and longtime partner used to say, every tub has to stay on its own bottom in Illinois. In that case, they had their reasons. But what it came down to. But what did they do? They denied him a wage differential. Yes, and it came here as a denial. And it came up here and we affirmed it. That's right. And that's. . . This is not a situation where we reversed the commission in Dawson under the facts. Yes. We affirmed the commission. Yes. Manifest wage issue. And you're in the same position here. You have a decision from the commission, and are you going to affirm it or not? You did affirm Dawson. I'm asking that you affirm this one, even though the outcomes were different. But they were different for a good reason. You know, when I heard you talking earlier when Mr. Muller was up here, and I'm thinking about what a wage differential means, and when a person comes to the office or when we're looking at the records and we're deciding is this going to be a wage differential, there are some things we look at. First thing is, was this man precluded from his last job? And now, after Dawson, I want some physical preclusion, not just a medical contraindication. Next, did he get a new job that earned less? Next, was that new job appropriate for him? And then, are you able to prove what he is earning or what he's able to earn? Now, then, after that's done, we have to say, is this a great case medically? Is this case going to stand the scrutiny it's going to get? And in doing that, we think, is there treat or help, or is this just two experts coming it out? And then we look at the company's doctor. Did the company's doctor give us some daylight to run to? When it passes all those hurdles, we know we've got a potential wage differential. And that's exactly what we have in this case. The commission decided in this case that we cleared all those hurdles. One of those hurdles is the wages that this man could make if he'd kept his regular job. And I think the choices of respondents' case citations was interesting. First, the Dawson case. It's got nothing to do with this one. It's completely different. And second one was the Old Ben case. It cited Old Ben. And what I liked about that citation was, in Old Ben, the man did receive a wage differential. The appellate court upheld the commission. But the one piece of evidence I liked is that to prove what this man could make, if he were still in the full performance of his job, the petitioner put on a page from the bituminous wage agreement, just like happened here. And the argument from the other side wasn't that, oh, you shouldn't do that. You've got to take whatever the last wages were. It was only, was he going to be a Class I or Class V? And the commission took that bituminous wage agreement and gave him the wage that he would be making if he still had that job on the day of arbitration. So, I mean, I think that's a case I should cite. So, it's a, I think this is just a very simple matter that the commission did its job. It looked at everything. There's not a single issue on which there is not support in the record. And I ask that you affirm the commission. Thank you. Thank you, counsel. Counsel, you may reply. The purpose of a wage differential is to make sure Mr. Goodson, in this case, and anybody else doesn't lose any money because of an occupational disease or an injury. And my position here, of course, is that Mr. Goodson voluntarily already reduced his income when he left coal mine employment and went to be an employee in the hardware store. When the diagnosis came around, it did not cause him to leave coal mine employment, number one, but it also didn't cause him to lose any money because he'd already left coal mining and taken the job in the hardware store where he was making less money. He didn't lose his job in the hardware store, obviously, and he didn't make less money working in the hardware store after the diagnosis came around. Now, I'm not going to go through everything in the Dawson case again, but I still want to point out the similarities between that case and this case. I know that the big difference is, in that case, the commission ruled in favor of the coal company as opposed to this case, but when the facts are the same, the results should be the same. The commission made a mistake in this case. Their decision is against the manifest way to the evidence, and that's why it should be reversed and you should remand it to them. One other thing I want to add before I get out of here is I don't think, in terms of the actual wages that he could be earning, that the claimant met his burden of proof, and I pointed that out in my brief, but the evidence shows that he obviously got more money every year from a certain point up to the point of the year in which we tried the case, but that leaves years before that when we don't know how much he was making, and as I said before, to give him how many ever years of benefits, seven years, let's say, based upon a wage that was in 2014, when we know what it was before that and it was less, makes no sense. An opposite conclusion to me is clearly apparent there, that you need to take those other wage amounts into consideration. Thank you. Thank you, counsel, both for your arguments in this matter. If you take no advisement, written disposition shall issue. If clerks can, we can briefly accept.